## <u>Exhibit A</u>

**Amended Complaint**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:                                              :   Chapter 11
                                                    :
      CELADON GROUP, INC., *et al.*,[1]          :   Case No. 19-12606 (KBO)
                                                    :
      Debtors.                                   :   (Jointly Administered)
                                                    :

-------------------------------------------------------------x

TA DISPATCH, LLC, an Alabama                        :
limited liability company,                          :
                                                    :
                                                    :
      Plaintiff,                                 :
                                                    :
v.                                                  :   Adv. No. 20-50117 (KBO)
                                                    :
CELADON TRUCKING SERVICES, INC., a                  :
New Jersey corporation, CELADON LOGISTICS           :
SERVICES, INC., a Delaware corporation,             :
CELADON GROUP, INC., a Delaware                     :
corporation, and HYNDMAN TRANSPORT                  :
LIMITED, an Ontario corporation,                    :
                                                    :
      Defendants                                 :
                                                    :

-------------------------------------------------------------x

## FIRST AMENDED VERIFIED COMPLAINT

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); Vorbas, LLC (8936). The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

Plaintiff TA Dispatch, LLC ("Plaintiff")[2] respectfully files this *Amended Verified Complaint* (the "Amended Complaint") against Celadon Trucking Services Inc. ("Celadon Trucking"), Celadon Logistics Services Inc. ("Celadon Logistics"), Celadon Group, Inc. ("Celadon Parent"), and Hyndman Transport Limited ("Hyndman Transport," with Celadon Trucking, Celadon Logistics, and Celadon Parent, "Defendants"). Defendants, along with certain affiliates of Celadon Parent, are debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases. In support of its Amended Complaint, Plaintiff respectfully states and alleges as follows:

## NATURE OF THE ACTION

1.      This is an adversary proceeding brought pursuant to Rules 7001(1), (7), (9), and (10), 7015(a)(2), 7065, and 9027(g) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 105 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

2.      Plaintiff originally filed this action under the caption *TA Dispatch, LLC v. Celadon Trucking Services, Inc., Celadon Logistics Services, Inc., Celadon Group, Inc. and Hyndman Transport Limited*, C.A. No. 2019-0960-SG (the "State Court Action"), in the Court of Chancery of the State of Delaware on or about December 2, 2019.

3.      On or about January 21, 2020, the Debtors removed the State Court Action to the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to 28 U.S.C. § 1452(a) and Bankruptcy Rule 9027, thereby commencing this adversary proceeding. *See Notice of Removal* [D.I. 322].

4.      Plaintiff brings this action because (i) prior to the Petition Date, Defendants

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Transaction Documents.

improperly refused to remit to Plaintiff approximately $8,884,949.34, comprising (x) $2,328,302.44 in funds specifically earmarked for Plaintiff (including, without limitation, Inadvertent Receivables and Purchased A/R, each as defined below) and (y) approximately $6,556,646.90 of CSA Proceeds (as defined below); (ii) postpetition,[3] as of January 28, 2020, Defendants improperly refused to remit $442,817.51 in postpetition CSA Proceeds; (iii) Defendants improperly committed to use Plaintiff's funds to run their business operations because Defendants were (and are) insolvent; and (iv) Defendants previously improperly terminated certain IT Services (as defined below) that Defendants are required to provide to Plaintiff under the Transaction Documents and which are fundamental to Plaintiff's ongoing operation of its business and the businesses of Plaintiff's customers.

5.      Defendants' continuing course of conduct is unfair and unconscionable conduct and has resulted in Defendants being unjustly enriched at Plaintiff's expense.  Prior to filing for relief under Title 11 of the Bankruptcy Code, Defendants operated their business using Plaintiff's Accounts Receivable and CSA Proceeds (as defined below).  Now, having sought protection under Title 11, Defendants have been utilizing Plaintiff's cash—which Defendants were required to turn over to Plaintiff pursuant to the Transaction Documents—to pay their secured creditors, finance a sale process, and avoid converting the Debtors' cases to chapter 7.

6.      As set forth more fully below, Defendants have refused to comply in full with their express obligations under the Transaction Documents (as defined herein) to remit certain Accounts Receivable (as defined herein) and other amounts to which Plaintiff is specifically entitled, regardless of whether billed or received by Defendants or Plaintiff.

---

[3]      Postpetition, pursuant to sections 3.2 and 3.4 of the Final DIP Order, Defendants have been remitting to Plaintiff certain of the Plaintiff's Accounts Receivable on a weekly basis. As of January 28, 2020, Defendants had remitted a total of $1,325,292.89 of Inadvertent Receivables.  Additionally, approximately $1,005,785.51 in CSA Proceeds have been invoiced postpetition but not otherwise remitted by Defendants or any Customers.

7. These Accounts Receivable and other amounts, including certain CSA Proceeds (as defined herein) are the Plaintiff's property. Plaintiff—not the Defendants, any of the Debtors or their estates, or their creditors—is the sole owner of these funds. The various Transaction Documents are adamantly clear that Plaintiff is the sole party with any interest in these amounts.

8. Plaintiff is in the business of providing customers a wide range of trucking and transportation management services in third-party logistics, full-service brokerage, and on-site materials handling and warehousing.

9. Celadon Parent is a cross-border carrier and, through its subsidiaries, provides long haul, regional, local, dedicated, intermodal, temperature-protected, and expedited freight service across the United States, Canada, and Mexico. Upon information and belief, Celadon Trucking, Celadon Logistics, and Hyndman Transport are subsidiaries of Celadon Parent.

10. Defendants' improper retention and use of Plaintiff's earmarked funds arises from an Asset Purchase Agreement, effective April 1, 2019 (the "APA"). Under the APA, Defendants Celadon Trucking, Celadon Logistics, and Hyndman Transport sold to Plaintiff the rights, operations, and assets associated with a transportation-logistics and brokerage-services business that offers freight consolidation, freight forwarding, transportation management, and value-added warehousing (the "Purchased Assets").

11. In addition to the APA, to effectuate the sale and transfer of the Purchased Assets, Plaintiff and Defendants entered into a number of ancillary agreements. These include, but are not limited to, a Transition Services Agreement (the "TSA"), a Capacity Solutions/Denver LTL Agreement (the "CSA"), a Co-Broker Agreement, and various Independent Agency Agreements between Plaintiff and certain of the Defendants (the "Agency Agreements" and, together with the APA, TSA, CSA, and Co-Broker Agreement, the "Transaction Documents").

12.     Under the CSA, Co-Broker Agreement, and Agency Agreements, Celadon Trucking and Celadon Logistics agreed that certain freight loads tendered by customers to the Defendants would be transferred to Plaintiff pursuant to the CSA to: (a) broker to a third-party carrier under the brokerage authorities of Celadon Trucking and Celadon Logistics pursuant to the Agency Agreements; or (b) broker to a third-party carrier under Plaintiff's brokerage authority pursuant to the Co-Broker Agreement.

13.     Under the Co-Broker Agreement, Celadon Trucking and Celadon Logistics would broker certain shipments to Plaintiff pursuant to their DOT brokerage authorities,[4] and Plaintiff would then broker the shipments to the transporting carriers pursuant to Plaintiff's DOT brokerage authority. In this scenario, Plaintiff would directly contract with the transporting carriers.

14.     Under the Agency Agreements, Celadon Trucking and Celadon Logistics would tender shipments to Plaintiff and Plaintiff would broker the freight to the transporting carriers pursuant to Celadon Trucking and Celadon Logistics' DOT brokerage authorities. In this scenario, Plaintiff would utilize Celadon Trucking and Celadon Logistics' contracts with the transporting carriers.

15.     Under the Co-Broker Agreement and Agency Agreements, Plaintiff was obligated to pay the transporting carriers and did so on all occasions.

16.     Because Plaintiff is not a motor carrier, Plaintiff had two options under the CSA, Co-Broker Agreement, and Agency Agreements: (i) find a transporting carrier; or (ii) turn the load down. However, the latter was not a real option because Plaintiff was obligated to accept the loads under the terms of the CSA.

---

[4]     DOT brokerage authority is required by the Federal Motor Carrier Safety Administration for companies that arrange for the transportation of freight by carriers in interstate commerce. The Federal Motor Carrier Safety Administration is the government agency that regulates the trucking industry.

17.    For certain of the customer loads under the Transaction Documents, Celadon Trucking and/or Celadon Logistics handled the customer billing and invoicing, despite the fact that Plaintiff performed the transportation-related services for those loads and paid the transporting carriers (the "Indirect CSA Loads").

18.    Under the Transaction Documents, amounts billed and received from customers related to the Indirect CSA Loads (the "CSA Proceeds") were to be held at all times for Plaintiff's benefit.

19.    Indeed, the Co-Broker Agreement and the Agency Agreements each provide that Plaintiff *shall* be paid and *shall* be entitled to all gross revenue billed to Customers for shipments arranged according to the Transaction Documents—*i.e.*, the CSA Proceeds.    The Co-Broker Agreement and the Agency Agreements unambiguously provide that the CSA Proceeds are property of the Plaintiff and are otherwise for Plaintiff's benefit, regardless of whether billed or received by Plaintiff of Defendants.    Additionally, under the Agency Agreements, such CSA Proceeds *shall* be remitted within fifty (50) days of receipt of an invoice from Plaintiff.    *See* Ex. B, Appendix A; *see also* Ex. D, Appendix A.

20.    Plaintiff's Accounts Receivable in the possession of Defendants fall into two categories:  designated accounts receivable and inadvertent accounts receivable.    Under the APA, the Co-Broker Agreement, and Agency Agreements, to facilitate a smooth transition of the Purchased Assets from Defendants to Plaintiff, Plaintiff appointed Celadon Logistics and Celadon Trucking as its agents for the purpose of collecting designated accounts receivable (the "Designated Receivables") on behalf of Plaintiff.    Additionally, certain third-parties inadvertently remitted to the Defendants payment of accounts receivable owned by Plaintiff that should have been remitted directly to Plaintiff, as the new owner of the Purchased Assets (the "Inadvertent

Receivables," and together with the Designated Receivables, the "Accounts Receivable").

21.     The parties' initial dispute arose when Defendants failed to remit to Plaintiff certain accounts receivable owned by Plaintiff that Defendants received on behalf of Plaintiff. The dispute expanded to include: (i) Defendants receiving and improperly retaining Accounts Receivable owned by Plaintiff that Defendants have continued to receive from customers transitioned to Plaintiff; (ii) Defendants declining to remit to Plaintiff approximately $6,556,646.90 of CSA Proceeds prepetition and $442,817.51 of postpetition CSA Proceeds; and (iii) Defendants spending, dissipating, or compromising Plaintiff's Accounts Receivable and CSA Proceeds.

22.     Defendants will continue to receive more Designated Receivables on behalf of Plaintiff and, upon information and belief, certain third parties may inadvertently continue to remit to Defendants payment of Accounts Receivable and that should be remitted directly to Plaintiff, which will increase the amount of Inadvertent Receivables. Plaintiff is entitled to prompt receipt from Defendants of all Accounts Receivable and CSA Proceeds that are currently in Defendants' possession or that may be collected by Defendants in the future.

23.     Defendants have made clear they will not remit to Plaintiff the Accounts Receivable or the CSA Proceeds. Instead, Defendants have revealed they used Plaintiffs' Accounts Receivable and CSA Proceeds to fund their operations and make payments to third parties.

24.     Specifically, on or about November 26, 2019, Celadon Parent's Chief Executive Officer, Paul Svindland, represented to Plaintiff during an in-person meeting that: (i) Defendants were insolvent, even calling Defendants "broke"; (ii) Defendants did not dispute the monies owed to Plaintiff, but Defendants were unable to turn over those amounts to Plaintiff; (iii) Defendants were unable to secure capital from other sources to reduce their illiquidity; (iv) Defendants spent most, if not all, of the Accounts Receivable and CSA Proceeds in their possession; (v) Defendants

intended to spend the remaining Accounts Receivable and CSA Proceeds in their possession and future Accounts Receivable and CSA Proceeds they receive; (vi) Defendants were contemplating filing for bankruptcy in the very near future; and (vii) Defendants retained bankruptcy counsel. Mr. Svindland even remarked how Defendants "screwed" Plaintiff.

25.    On or around November 28, 2019, Defendants advised Plaintiff that all future correspondence should go through their bankruptcy counsel.  General Counsel for Celadon Parent indicated to Plaintiff that Defendants' bankruptcy counsel was concerned that Defendants were being too candid with Plaintiff in prior conversations.

26.    In addition, on November 29, 2019, Defendants Celadon Trucking and Celadon Parent terminated Plaintiff's access to certain IT systems that Defendants control, which are critical to the success of Plaintiff's business.  This was done in violation of the TSA.  Defendants Celadon Trucking and Celadon Parent terminated Plaintiff's access to the certain information technology services ("IT Services") as a result of Plaintiff's parent company, PS Logistics, declining to loan funds to Defendants and making a demand for payment of the Accounts Receivable and CSA Proceeds.

27.    Both Accounts Receivable and CSA Proceeds were at all times to be specifically earmarked and held for Plaintiff's benefit because they were never property of the Defendants. This was confirmed on January 7, 2020, when the Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection To Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Modifying The Automatic Stay; and (V) Granting Related Relief* [D.I. 230] (the "Final DIP Order").  Pursuant to the terms of the Final DIP Order,

the Defendants recognized that the Account Receivables and CSA Proceeds are Plaintiff's property and not property of the Debtors' estates.  Indeed, under this Order, Defendants have turned over to Plaintiff certain Accounts Receivables received after the Petition Date (as defined herein).

28.     To that end, in connection with the Designated Receivables, Plaintiff seeks a declaration from the Court that:  (i) Plaintiff appointed Celadon Trucking and Celadon Logistics as its agents to collect the Designated Receivables, which are owned exclusively by Plaintiff, on behalf of Plaintiff in connection with the Purchased Assets; (ii) Defendants are required under the APA and CSA to remit to Plaintiff the Designated Receivables within five business days of Defendants receiving the Designated Receivables; and (iii) Defendants violated their obligation to remit the Designated Receivable to Plaintiff.

29.     In connection with the Inadvertent Receivables, Plaintiff seeks a declaration from the Court that:  (i) the Inadvertent Receivables are owned by Plaintiff; (ii) Defendants are required under the Transaction Documents to remit the Inadvertent Receivables to Plaintiff; and (iii) Defendants violated their obligation to remit the Inadvertent Receivables to Plaintiff.

30.     In connection with the CSA Proceeds, Plaintiff seeks a declaration from the Court that:  (i) Plaintiffs failed to fulfill their obligation to remit to Plaintiff, as of January 28, 2020, approximately $6,556,646.90 of prepetition CSA Proceeds and $442,817.51 of postpetition CSA Proceeds owed to Plaintiff under the CSA, the Co-Broker Agreement, and the Agency Agreements; and (ii) Defendants are required to remit any additional CSA Proceeds to Plaintiff within fifty (50) days of Plaintiff invoicing Defendants, as provided under the CSA.

31.     In connection with the IT Services, Plaintiff seeks a declaration from the Court that Defendants are obligated under the Transaction Documents to provide Plaintiff with uninterrupted

access to the IT Services as is are reasonably necessary for the performance of, and for Plaintiff to receive the benefit of, the "Seller Services" under the TSA.

32.     Plaintiff also seeks an Order from the Court compelling Defendants to specifically perform their obligation to remit to Plaintiff all Accounts Receivable and CSA Proceeds, including to-be-received Accounts Receivable and CSA Proceeds owed to Plaintiff.

33.     In the interim, Plaintiff seeks an Order from the Court:  (i) compelling Defendants to deposit the Accounts Receivable and CSA Proceeds, including Accounts Receivable and CSA Proceeds received in the future during the pendency of the litigation, to Plaintiff, or if Defendants dispute that certain amounts for Accounts Receivable and CSA Proceeds are owed to Plaintiff, then into an escrow account for those disputed amounts and (ii) enjoining Defendants from dissipating or otherwise transferring any Accounts Receivable or CSA Proceeds, including to-be-received Accounts Receivable and CSA Proceeds, except as otherwise ordered by the Court.

## **JURISDICTION AND VENUE**

34.     The Bankruptcy Court has jurisdiction to consider this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

35.     This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Rule 7008–1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents[5] to the entry of a final order by the Bankruptcy Court in connection with this adversary proceeding to the extent it is later determined that the

---

[5]     For the avoidance of doubt, Plaintiff does not consent, and has never consented, to entry of a final order by the Bankruptcy Court in connection with the complaint filed by Plaintiff on January 6, 2020 in the Superior Court of Delaware, captioned as *TA Dispatch, LLC, an Alabama limited liability company, v. MidCap Funding IV Trust, a Delaware Statutory Trust*, case number N19C-12-237 MMJ CCLD, which the defendant therein purported to remove to the Bankruptcy Court on January 23, 2020 [D.I. 1, Adv. No. 20-50430 (KBO)].

Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

36.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

37.     Plaintiff TA Dispatch is an Alabama limited liability company, with a principal place of business in Ensley, Alabama.  Plaintiff is in the business of providing customers with a wide range of trucking and transportation management services in third-party logistics, full-service brokerage, and on-site materials handling and warehousing.

38.     Upon information and belief, Defendant Celadon Trucking is a New Jersey corporation, with a principal place of business in Indianapolis, Indiana.

39.     Upon information and belief, Defendant Celadon Logistics is a Delaware corporation, with a principal place of business in Indianapolis, Indiana.

40.     Upon information and belief, Defendant Hyndman Transport is an Ontario corporation, with a principal place of business in Ontario, Canada.

41.     Upon information and belief, Defendant Celadon Parent is a Delaware corporation, with a principle place of business in Indianapolis, Indiana.

42.     Upon information and belief, Defendants Celadon Trucking, Celadon Logistics, and Hyndman Transport are subsidiaries of Celadon Parent.

## FACTUAL BACKGROUND

A.     **The Transaction Documents**

43.     On April 15, 2019, Plaintiff and Defendants Celadon Trucking, Celadon Logistics, and Hyndman Transport entered into the Transaction Documents.  The APA was effective as of April 1, 2019 (the "Effective Date").  The APA is attached as Exhibit A, the Agency Agreements

are attached as Exhibit B, the TSA is attached as Exhibit C, the CSA is attached as Exhibit D, and the Co-Broker Agreement is attached as Exhibit E.

44.     The APA provides for the sale of substantially all of the assets of the business of Defendant Celadon Logistics, along with certain ancillary assets from Defendants Celadon Trucking and Hyndman Transport (defined above as the "Purchased Assets").  *See* Ex. A § 1.01.

45.     The Purchased Assets transferred to Plaintiff through the APA include all of Defendants' rights, operations, and assets associated with a transportation-logistics and brokerage-services business that offers, among other services, freight consolidation, freight forwarding, transportation management, and value-added warehousing.  *See* Ex. A, Schedules 1.01(a)-(c).

46.     The APA expressly provides the Purchased Assets include, but are not limited to, "all of the [Defendants'] rights, title and interests" under various contracts and other assets enumerated on Schedules 1.01(a), 1.01(b), and 1.01(c) of the APA.  *See* Ex. A § 1.01(a)-(c). Plaintiff acquired all accounts receivable due and payable to Defendants in connection with those acquired contracts (collectively, the "Purchased A/R").  *Id.*

47.     In the APA, Defendants and Plaintiff acknowledged that, on and after the Effective Date, Defendants might receive certain amounts of the Purchased A/R under contracts that were sold as part of the Purchased Assets.

48.     Under the APA, as well as Agency and Co-Broker Agreements entered into on the same date, Plaintiff appointed Celadon Logistics and Celadon Trucking as its agents for the purpose of collecting designated Purchased A/R on behalf of Plaintiff (defined above as the "Designated Receivables").

49.     Additionally, certain third parties inadvertently remitted to the Defendants payment of accounts receivable owned by Plaintiff that should have been remitted directly to Plaintiff, as

the new owner of the Purchased Assets (defined above as the "Inadvertent Receivables," and together with the Designated Receivables, the "Accounts Receivable").

50.    Because the Purchased A/R is owned by Plaintiff, Defendants (as Sellers) and Plaintiff (as Buyer) acknowledged and agreed in Section 4.05 of the APA that the Purchased A/R must be promptly remitted to Plaintiff:

> <u>Receivables and Other Payments</u>.  From and after Closing, if Sellers or any of their Affiliates receive or collect any funds relating to any accounts receivable that are included in the Purchased Assets or any other Purchased Asset, Sellers or their Affiliate shall remit such funds to Buyer **within (5) Business Days after its receipts thereof.**

*See* Ex. A § 4.05 (emphasis added).

51.    The APA also discusses and incorporates the CSA (discussed more fully below), the Co-Broker Agreement, and the Agency Agreements, under which Plaintiff and Defendants agreed that certain freight loads tendered by a customer to Defendants would then be transferred to Plaintiff to broker to a third-party carrier under the brokerage authority of Celadon Trucking and Celadon Logistics or under Plaintiff's brokerage authority:

> <u>Capacity Solutions</u>.  With respect to any load that is tendered by a customer into the Celadon AS400, transferred into Mercury Gate/Logistics system, and covered by a third-party carrier ("<u>Capacity Solutions</u>"), the terms and conditions set forth in the CSA … will apply.

*See* Ex. A § 4.03; *see also* Ex. C § 1.01(b).

52.    Further, Defendants acknowledged and agreed in Section 7.17 of the APA that (i) Plaintiff would suffer irreparable harm if Defendants failed to comply with their obligation to remit the Purchased A/R to Plaintiff in accordance with Section 4.05 and (ii) Plaintiff would be entitled to injunctive relief to compel Defendants to specifically perform their obligation to remit the Purchased A/R to Plaintiff:

> <u>Injunctive Relief</u>.   The parties acknowledge and agree that irreparable injury would occur if any provision of this Agreement were not performed in accordance with the terms thereof and that the parties shall be entitled to specific performance and injunctive relief, without posting bond or other security, and without the necessity of proving actual damages.

*See* Ex. A § 7.17.

**B.      Plaintiff Enters Into A Transition Services Agreement With Celadon Trucking And Celadon Parent**

53.      Also on April 15, 2019, Celadon Trucking and Celadon Parent entered into a Transition Services Agreement (defined above as the "TSA"), effective as of the Effective Date, with Plaintiff in order to ensure the orderly transition of the Purchased under the APA.  The TSA is attached as Exhibit C.

54.      Section 6.12 of the TSA contains a similar provision to Section 7.17 of the APA in that (i) Plaintiff would suffer irreparable harm if Defendants failed to comply with their obligations under the TSA and (ii) Plaintiff would be entitled to injunctive relief.  *See* Ex. B § 6.12.

55.      The TSA also provides that Celadon Trucking and Celadon Parent will continue to provide certain "Seller Services" (as defined in the TSA) as are "reasonably necessary for the performance of, and for [Plaintiff] to receive the benefit of," such "Seller Services."  These "Seller Services" include, without limitation, the IT Services, and more specifically, access to and use of the Access Control Systems for the Indianapolis Brokerage Office and the Laredo Warehouse Office, as well as access to and use of the following: "DPS," "AS400," "Pegasus Imaging," and the shared "S:Drive."

**C.      Plaintiff And Defendants Enter Into A Capacity Services Agreement**

56.      Also on April 15, 2019, Plaintiff entered into a Capacity Services Agreement/Denver LTL Agreement (defined above as the "CSA"), effective as of the Effective

Date, with Defendants Celadon Trucking, Celadon Logistics, and Hyndman Transport. The CSA is attached as Exhibit D.

57.     Section 6.13 of the CSA contains a similar provision to Section 7.17 of the APA and an identical provision to Section 6.12 of the TSA, in that (i) Plaintiff would suffer irreparable harm if Defendants failed to comply with their obligations under the CSA and (ii) Plaintiff would be entitled to injunctive relief. *Compare* Ex. C § 6.13 *with* Ex. A § 7.17 *and* Ex. B § 6.12.

58.     Under the CSA, the parties agreed that certain freight loads tendered by a customer to Defendants would then be transferred to Plaintiff to either fulfill itself or broker to a third-party carrier. *See* Ex. C § 1.01(b).

59.     Under the CSA, "Direct CSA Loads" were to be billed by Plaintiff and paid directly to Plaintiff by the customer. Indirect CSA Loads are billed by and paid to Defendants, who agreed to remit receipts pertaining to those load requests to Plaintiff, who actually performed the transportation-related services and paid the transporting carriers. *See* Ex. C. § 1.01(b).

60.     For all "Indirect CSA Loads" fulfilled by Plaintiff, the CSA provides Plaintiff will invoice Defendants and in turn, Defendants are obligated remit funds they hold on behalf of Plaintiff pursuant such invoices to Plaintiff within fifty days of receipt of such invoice (defined above as "CSA Proceeds"). *See* Ex. C § 1.03.

61.     In addition, upon information and belief, as of January 28, 2020, Defendants have collected, with respect to Indirect CSA Loads and on Plaintiff's behalf, approximately $6,556,646.90 of prepetition CSA Proceeds and $442,817.51 of postpetition CSA Proceeds that have not been remitted to Plaintiff in accordance with the terms of the APA and CSA. The CSA Proceeds are Plaintiff's property, received by Defendants for Plaintiff's sole benefit.

62.     Under the CSA, Co-Broker Agreement, and Agency Agreements, Celadon Trucking and Celadon Logistics agreed that certain freight loads tendered by customers to the Defendants would be transferred to Plaintiff to broker to a third-party carrier (directly under the Co-Broker Agreement or indirectly under the Agency Agreements).

63.     Under terms of the Co-Broker Agreement, all revenue billed for the brokerage of third-party loads is the property of Plaintiff:

> [Plaintiff] shall be paid and/or entitled to all gross revenue billed to Customers for shipments arranged pursuant to or in accordance with this Agreement.  Such revenue shall be for the benefit of [Plaintiff], regardless of whether billed or received by [Plaintiff] or [Celadon Trucking Services, Inc. and Celadon Logistics Services, Inc.]

*See* Ex. D, Appendix A

64.     All of Plaintiff's CSA Proceeds *shall* be remitted to Plaintiff, in its capacity as Co-Broker, by Defendants "as soon as practicable and in any event within 10 days of receipt (or 50 days on invoice if billed by Broker)."  *See* Ex. D, Appendix A.

65.     Appendix A to the Agency Agreements further demonstrates that all revenue billed in accordance with the Agency Agreements is "for the benefit" of Plaintiff, and Defendants are required to remit such amounts to Plaintiff within 50 days of invoicing:

> Subject to the terms and conditions in the CSA, [Plaintiff] shall be paid and entitled to all gross revenue billed to Customers for Shipments arranged pursuant to or in accordance with this Agreement.  Such revenue shall be for the benefit [Plaintiff], regardless of whether billed or received by [Celadon Trucking Services, Inc., Celadon Logistics Services, Inc.] or [Plaintiff].

66.     All of Plaintiff's CSA Proceeds *shall* be remitted to Plaintiff, in its capacity as Agent, by Defendants within 50 days of invoice.  *See* Ex. B, Appendix A.

67.     Under the APA, Co-Broker Agreement, and Agency Agreements, Plaintiff appointed Celadon Logistics Services Inc. and Celadon Trucking Services Inc. as its agents for the purpose of collecting the Accounts Receivable and CSA Proceeds.

### D.     Defendants Experience Significant Financial Issues

68.     Approximately nine (9) months following the parties' entry into the Transaction Documents, at a meeting on November 13, 2019, the Chief Executive Officer for Celadon Parent, Paul Svindland, advised that Defendants were experiencing significant financial issues, including a liquidity crisis.

69.     At the November 13 meeting, Mr. Svindland stated the annual revenues of Defendants decreased from $1.18 billion to $500 million.  Mr. Svindland also represented that Defendants had negative operating income and were not able to meet their debt obligations as they come due.

70.     Mr. Svindland further advised that, over the ninety (90) days prior to November 13, 2019, Defendants depleted $18 million in cash reserves in order to continue to operate their businesses.

71.     Mr. Svindland also explained that Defendants were insolvent, lacked significant liquidity, and were unable to secure capital to mitigate their illiquidity.

### E.     Defendants Stop Remitting The Accounts Receivable To Plaintiff, As Required, After Defendants Experienced Liquidity Issues

72.     Defendants initially remitted to Plaintiff the Accounts Receivable relating to the Purchased A/R, as well as the CSA Proceeds, in accordance with the Transaction Documents. However, on or about August 6, 2019, Defendants began to delay turning over these funds they held on Plaintiff's behalf and failed to remit the full amount due.  More recently, Defendants ceased

remitted the Accounts Receivable and CSA Proceeds.  Defendants failed to remit these amounts to Plaintiff because they began using Plaintiff's funds to prop up their business operations in an attempt to avoid (or at least better position themselves for) bankruptcy.

73.     Defendants were required to remit to Plaintiff (i) Accounts Receivable and (ii) CSA Proceeds on or about November 15, 2019, but Defendants failed to do so.

74.     Previously, on November 13, Defendants informed Plaintiff that they would turn over Plaintiff's Accounts Receivable on November 22 and November 29.   Defendants' commitment to remit the Accounts Receivable was reaffirmed in a joint call between the parties on November 25.

75.     Following the November 25 joint call, Defendants met with Blue Torch Capital, LP ("Blue Torch"), Celadon Parent's majority stockholder, to discuss a liquidator's report and potential plan going forward.

76.     Upon information and belief, as of January 28, 2020, Defendants have collected approximately $2,328,302.44 in Accounts Receivable owned by, and earmarked for, Plaintiff that Defendants did have not remitted to Plaintiff.   As stated above, Defendants also failed (and continue to fail) to remit approximately $6,556,646.90 of prepetition CSA Proceeds and $442,817.51 of postpetition CSA Proceeds Plaintiff, as required under the Transaction Documents.

**F.     Defendants Admitted They Are Improperly Using Plaintiff's Accounts Receivable And CSA Proceeds To Offset Defendants' Liquidity Issues And Committed To Continue Dissipating Plaintiff's Property**

77.     Defendants' liquidity issues and failure to remit the Accounts Receivable and CSA Proceeds puts Plaintiff and its assets at substantial risk.

78.     On November 26, 2019, Mr. Svindland and Plaintiff met to discuss Defendants' meeting with Blue Torch.  Mr. Svindland conceded at this meeting that Defendants were insolvent and could not remit the amounts owed to Plaintiff.

79.     Mr. Svindland requested Plaintiff and/or its affiliate lend Defendants money. Plaintiff declined to consider extending Defendants any capital until Defendants fulfilled their obligation to remit at least some of the Accounts Receivable and CSA Proceeds to Plaintiff.

80.     Mr. Svindland advised Plaintiff that Defendants had spent most, if not all, of the Accounts Receivable and CSA Proceeds in their possession.  As such, Defendants were (and continue to be) unable to turn over Plaintiff the Accounts Receivable or CSA Proceeds.

81.     Mr. Svindland further advised Plaintiff that Defendants intended to withhold the remaining Accounts Receivable and CSA Proceeds in their possession and any other Accounts Receivable and CSA Proceeds they receive, and that they did not intend to curb their past practice of converting those funds for their own use and benefit.

82.     Mr. Svindland even commented how Defendants "screwed" Plaintiff.  Indeed, Mr. Svindland stated that Defendants had not appropriately segregated Plaintiff's Accounts Receivable and CSA Proceeds.  Mr. Svindland also acknowledged that Plaintiff had maintained, and currently has, more accurate insight into Defendants' own Treasury Management with understanding how Defendants have spent their capital.

83.     Presciently, Mr. Svindland threatened that Defendants would file for bankruptcy in the near future if Plaintiff did not extend Defendants financing.

84.     Importantly, during and following their November 26, 2019 meeting, Mr. Svindland and other senior executives at Defendants confirmed they owed significant amounts to Plaintiff that they could not (and cannot) turn over.

85.     On November 27, 2019, Plaintiff sent Defendants a demand letter for the full

amounts owned by Plaintiff that Defendants failed to turn over, and demanded that such funds be

surrendered by November 29, 2019.  However, with respect to amounts owed prior to the Petition

Date, Defendants have failed to remit any Accounts Receivable to Plaintiff since the demand was

sent.

86.     After Plaintiff made this demand and declined to provide financing to Defendants,

Defendants instructed Plaintiff to refer any further correspondence to Defendants' bankruptcy

legal counsel.

**G.     Celadon Parent's Recent SEC Filings**

87.     Celadon Parent's most recent filings with the U.S. Securities and Exchange

Commission ("SEC") paint a bleak picture.

88.     In its annual report on Form 10-K filed on September 30, 2019, Celadon Parent

reported:

> As Celadon Group, Inc. (the "Company") previously disclosed, the
> Company has determined that its previously filed financial
> statements for the fiscal years ended June 30, 2014, 2015, and 2016,
> including the unaudited quarterly financial statements for such fiscal
> years, and the fiscal quarters ended September 30, 2016 and
> December 31, 2016, should no longer be relied upon. The Company
> is currently working to restate certain historical periods and prepare
> financial statements for currently unfiled periods that conform with
> U.S. generally accepted accounting principles and Securities and
> Exchange Commission rules.  The Company believes that these
> processes will result in financial statement impacts for the fiscal year
> ended June 30, 2019 and such impacts have not been definitively
> determined at this time. Accordingly, the Company's filing of
> financial statements for its fiscal year ended June 30, 2019, will be
> delayed.

89.     Celadon Parent made the same public disclosure to the SEC in its quarterly report

on Form 10-Q filed on November 15, 2019.

90.     Upon information and belief, Celadon Parent has not filed an annual report on Form 10-K or quarterly report on Form 10-Q with actual financials since September 13, 2016 and February 10, 2017, respectively.

91.     Even the most recent reported financials from Celadon Parent's February 10, 2017 quarterly report on Form 10-Q paints a troubling picture, with an operating loss of $1.734 million, net loss of $1.525 million, and current liabilities exceeding current assets.  Upon information and belief, these already poor financials cannot be relied upon because Defendants' financial condition is, in reality, much worse, as represented to Plaintiff by Defendants' senior executives and the fact Celadon Parent has not reported actual financials to the SEC in years.

**H.     Defendants Terminate Plaintiff's Access To Critical IT Services After Plaintiff Declines To Provide Defendants Funding And Sends Defendants A Demand Relating To The Accounts Receivable And CSA Proceeds**

92.     On November 27, 2019, Plaintiff sent Defendants a letter objecting to Defendants' unauthorized retention and use of the Accounts Receivable and CSA Proceeds, and demanding that Defendants remit to Plaintiff, no later than November 29, 2019, the millions of dollars Defendants owe Plaintiff under the Transaction Documents.  The November 27, 2019 letter is attached as Exhibit F.

93.     Rather than remitting funds to Plaintiff in response to the November 27 letter, Defendants Celadon Trucking and Celadon Parent elected to cease Plaintiff's access to IT Services under the TSA that were critical to the operation of Plaintiff's business and, in turn, the business of its customers.

94.     As Defendants were aware at the time Plaintiff's IT Services were disrupted, Plaintiff was in the midst of transitioning its IT systems.

95.     Physical IT hardware was relocated and use of that hardware is dependent on access to the IT Services that Defendants terminated, namely transferring certain databases.  Without the IT Services, the IT hardware could not be utilized.

96.     Upon information and belief, Defendants could re-activate Plaintiff's access to the IT Services within hours, if not minutes, but initially refused to do so in light of Plaintiff's demand that Defendants turn over the Accounts Receivable and CSA Proceeds and Plaintiff's rejection of Defendants' request for financing.

97.     Subsequently, Defendants indicated the IT Services would be (and, since have been) re-activated pending Defendants investigating certain unidentified legal issues.

**I.      Defendants File Petitions for Relief under Chapter 11 of the Bankruptcy Code**

98.     On or around November 28, 2019, Defendants instructed Plaintiff to refer any further correspondence to Defendants' bankruptcy legal counsel.

99.     The General Counsel for Celadon Parent further indicated that Defendants' bankruptcy counsel was concerned how Defendants were too candid in prior conversations with Plaintiff.

100.    On December 8, 2019 (the "<u>Petition Date</u>"), each Defendant, along with other affiliates of Celadon Parent, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

101.    On December 10, 2019, in connection with first day proceedings, the Bankruptcy Court entered an *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection To Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Modifying The Automatic Stay; and (V) Granting Related Relief* [D.I. 61] (as amended and supplemented, the

"Interim DIP Order") (i) finding the Account Receivables and CSA Proceeds are Plaintiff's property, (ii) requiring the Debtors to segregate the Account Receivables and CSA Proceeds, and (iii) requiring any Account Receivables [and/or CSA Proceeds] in Defendants' possession to be remitted to Plaintiff.

102.    On January 7, 2020, the Bankruptcy Court entered the Final DIP Order, which provides as follows:

> The Debtors [including Defendants] collect certain receivables on behalf of [Plaintiff] (the "TA Dispatch Receivables"). *The TA Dispatch Receivables are not property of the Debtors' Estates*. Upon receipt from the Prepetition ABL Agent of proceeds of TA Dispatch Receivables, on a Cash Collateral Remittance Date, the *Debtors will segregate such TA Dispatch Receivables and remit them to [Plaintiff]* on a weekly basis beginning the week of December 15, 2019 within one (1) Business Day of each Cash Collateral Remittance Date.

*See* Final DIP Order, attached hereto as Exhibit G, §3.4.

103.    The DIP Budgets filed with the Interim DIP Order and Final DIP Order confirmed the severity of Defendants' liquidity crisis.

104.    Since the entry of the Interim DIP Order, Defendants have turned over approximately $1,325,292.89 in Inadvertent Receivables received after the Petition Date.

105.    However, despite the language contained in the Final DIP Order, Defendants have continued to refuse to remit any CSA Proceeds to Plaintiff.

106.    Defendants' continuing failure to remit any CSA Proceeds or prepetition Accounts Receivable to Plaintiff constitutes unfair and unconscionable conduct and results in Defendants being unjustly enriched at Plaintiff's expense. Indeed, by (i) operating its business prepetition using Plaintiff's Accounts Receivable and CSA Proceeds and (ii) paying its secured creditors postpetition with Plaintiff's CSA Proceeds, Defendants have been utilizing Plaintiff's cash—which Defendants were required to turn over to Plaintiff pursuant to the Transaction Documents—

initially to avoid filing petitions for relief under chapter 11 of the Bankruptcy Code and currently to avoid converting the Debtors' cases to chapter 7.

**J.     Defendants' Failure To Remit The Accounts Receivable And CSA Proceeds Is Irreparably Harming Plaintiff**

107.    Defendants' insolvency, coupled with its confessed plan to dissipate the Accounts Receivable, creates a significant risk that Plaintiff will never be able to collect its Accounts Receivable or CSA Proceeds, absent expedited injunctive relief precluding Defendants from dissipating or otherwise transferring the Accounts Receivable.

108.    Upon information and belief, certain creditors(s) of Defendants have the ability to monitor and sweep Defendants' bank accounts.  To the extent the Accounts Receivable are placed in any such account, Plaintiff's earmarked property is at risk of being taken by non-parties. Plaintiff's ultimate ability to collect its CSA Proceeds is also in jeopardy for the same reason.

<u>**COUNT I**</u>

**(BREACH OF CONTRACT AND DECLARATORY JUDGMENT REGARDING ACCOUNTS RECEIVABLE)**

109.    Plaintiff incorporates and restates each allegation above as if fully set forth below.

110.    Plaintiff contends that Defendants Celadon Trucking, Celadon Logistics, and Hyndman Transport are required under the Transaction Documents to remit to Plaintiff all the Accounts Receivable.

111.    Defendants have refused to remit to Plaintiff the Accounts Receivable, without citing any legal justification for their refusal.  Defendants have dissipated Plaintiff's Accounts Receivable for improper reasons and have committed to continue dissipating the Accounts Receivable in the future.

112.    There is a justiciable controversy between the parties as to the interpretation, application, and/or enforcement of the Transaction Documents, including the obligations of

Defendants owed to Plaintiff under the Transaction Documents, to remit to Plaintiff the Accounts Receivable.

113.     The Transaction Documents are each enforceable contracts between the parties, and Plaintiff has complied with all condition precedents applicable to it thereunder.

114.     Defendants have failed to fulfill their obligations under the Transaction Documents to remit to Plaintiff the Accounts Receivable in accordance with the terms of those agreements, as set forth above.

115.     Plaintiff has been damaged as a result of Defendant's violation and failure to perform their obligations under the Transaction Documents.

## COUNT II

### (BREACH OF CONTRACT AND DECLARATORY JUDGMENT REGARDING CSA PROCEEDS)

116.     Plaintiff incorporates and restates each allegation above as if fully set forth below.

117.     Plaintiff contends that Defendants Celadon Trucking, Celadon Logistics, and Hyndman Transport are required under the Transaction Documents to remit to Plaintiff all CSA Proceeds within fifty days of Plaintiff invoicing Defendants.

118.     As of January 28, 2020, Defendants have refused to remit to Plaintiff approximately $6,556,646.90 of prepetition CSA Proceeds and $442,817.51 of postpetition CSA Proceeds (and the arrearages continue to increase), without citing any legal justification for their refusal. Defendants have dissipated Plaintiff's CSA Proceeds for improper reasons and have committed to continue dissipating the CSA Proceeds in the future.

119.     There is a justiciable controversy between the parties as to the interpretation, application, and/or enforcement of the Transaction Documents, including the obligations of

Defendants owed to Plaintiff under the Transaction Documents to remit to Plaintiff the CSA Proceeds.

120.    The Transaction Documents are each enforceable contracts between the parties, and Plaintiff has complied with all condition precedents applicable to it thereunder.

121.    Defendants have failed to fulfill their obligations under the Transaction Documents to remit to Plaintiff the CSA Proceeds in accordance with the terms of those agreements, as set forth above.

122.    Plaintiff has been damaged as a result of Defendant's violation and failure to perform their obligations under the Transaction Documents.

## COUNT III

### (BREACH OF CONTRACT AND DECLARATORY JUDGMENT REGARDING IT SERVICES)

123.    Plaintiff incorporates and restates each allegation above as if fully set forth below.

124.    Plaintiff contends that Defendants Celadon Trucking and Celadon Parent are required under the TSA to provide Plaintiff with ongoing access to the IT Services.

125.    Defendants terminated Plaintiff's access to the IT Services without any justification other than Plaintiff declining to lend Defendants funds, which is not a permissible basis to terminate the IT Services.  Although Defendants Celadon Trucking and Celadon Parent re-activated the IT Services, upon information and belief, there is a risk that Defendants will terminate the IT Services in the near future.

126.    There is a justiciable controversy between the parties as to the interpretation, application and/or enforcement of the Transaction Documents, including the obligations of Defendants owed to Plaintiff under the APA and TSA to provide Plaintiff with ongoing access to the IT Services.

127.    The APA and TSA are both enforceable contracts between the Plaintiff and Defendants, and Plaintiff has complied with all condition precedents applicable to it under the APA and TSA, respectively.

128.    Defendants have failed to fulfill their obligations under the APA and TSA to provide Plaintiff with uninterrupted access to the IT Services, as set forth above.

129.    Plaintiff has been damaged as a result of Defendant's violation and failure to perform their obligations under the APA and CSA, respectively.

## COUNT IV

### (SPECIFIC PERFORMANCE REGARDING
### ACCOUNTS RECEIVABLE, CSA PROCEEDS, AND IT SERVICES)

130.    Plaintiff incorporates and restates each allegation above as if fully set forth below.

131.    Defendants are required under the Transaction Documents to remit the Accounts Receivable and CSA Proceeds to Plaintiff.

132.    Defendants initially remitted the Accounts Receivable and CSA Proceeds to Plaintiff; however, Defendants have ceased remitting the Accounts Receivable and CSA Proceeds in order to fund their own operations and address their liquidity needs.

133.    Defendants Celadon Trucking and Celadon Parent are obligated under the Transaction Documents to provide Plaintiff with ongoing, uninterrupted access to IT Services.

134.    Defendants Celadon Trucking and Celadon Parent initially provided Plaintiff with access to the IT Services; however, Celadon Trucking and Celadon Parent terminated Plaintiff's access to the IT Services because Plaintiff declined to lend Defendants money.

135.    Although the IT Services were restored following an objection from Plaintiff's legal counsel, based on information and belief, Plaintiff anticipates that Celadon Trucking and Celadon Parent will again terminate Plaintiff's access to the IT Services in the near future.

136.    Plaintiff lacks an adequate remedy at law to remedy Defendants' unlawful use and retention of the Accounts Receivable and CSA Proceeds or the unlawful disruption of the IT Services.

137.    Plaintiff requests the Court compel Defendants to specifically perform their obligations under the Transaction Documents to (i) remit to Plaintiff all Accounts Receivable owed; (ii) remit to Plaintiff the CSA Proceeds owed; and (iii) provide to Plaintiff uninterrupted access to the IT Services under the terms of the Transaction Documents.

## <u>COUNT V</u>

### (UNJUST ENRICHMENT REGARDING
### INADVERTENT RECEIVABLES AND CSA PROCEEDS)

138.    Plaintiff incorporates and restates each allegation above as if fully set forth below.

139.    Defendants knew they were undertaking an obligation to collect the Designated Receivables on behalf of Plaintiff and know or should know that the Inadvertent Receivables sent to Defendants are designated for, and owned by, Plaintiff.  Therefore, Defendants knew or should have known that they are required to remit to Plaintiff the Accounts Receivable.

140.    Defendants knew or should have known that they were required to remit the CSA Proceeds to Plaintiff pursuant to the terms of the Transaction Documents.

141.    Defendants do not have an economic interest in Plaintiff's Accounts Receivable or the CSA Proceeds.

142.    Plaintiff did not benefit in any way from Defendants' failure to remit to Plaintiff the Accounts Receivable or the CSA Proceeds.

143.    Plaintiff, however, enriched Defendants by entering into the Transaction Documents and acquiring the Purchased Assets because, as a consequence of the asset sale, (i) Plaintiff designated Defendants to receive the Designated Receivables and Defendants received

the Inadvertent Receivables that should have been directly remitted to Plaintiff and (ii) Defendants have unjustifiably retained the CSA Proceeds.

144.    Defendants have been unjustly enriched by their receipt of the Inadvertent Receivables and the retention of the CSA Proceeds, and Plaintiff has been correspondingly impoverished.

145.    Defendants have failed to make restitution to Plaintiff for the benefit that Plaintiff conferred upon Defendants.

146.    Defendants would be unjustly enriched if they were not required to remit the Inadvertent Receivables and the CSA Proceeds (plus interest) to Plaintiff.

147.    In equity, good conscience, and justice, Defendants should not be entitled to retain the windfall or economic benefits that would be conferred upon Defendants when Defendants received the Inadvertent Receivables and the CSA Proceeds.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.    In connection with the Designated Receivables, Plaintiff seeks a declaration from the Court that:  (i) Plaintiff appointed Defendants as its agents to collect the Designated Receivables, which are owned exclusively by Plaintiff, on behalf of Plaintiff in connection with the Purchased Assets; (ii) Defendants are required under the Transaction Documents to remit to Plaintiff the Designated Receivables within five (5) business days of Defendants receiving the Designated Receivables; and (iii) Defendants violated their obligation to remit the Designated Receivable to Plaintiff;

B.    In connection with the Inadvertent Receivables, Plaintiff seeks a declaration from the Court that:  (i) the Inadvertent Receivables are owned by Plaintiff; (ii) Defendants are required to remit the Inadvertent Receivables to Plaintiff; and (iii) Defendants violated their obligation to

remit the Inadvertent Receivables to Plaintiff;

C.      Alternatively and in connection with the Inadvertent Receivables, Plaintiff is entitled to restitution and disgorgement of the Inadvertent Receivables;

D.      In connection with the CSA Proceeds, Plaintiff seeks a declaration from the Court that: (i) Plaintiffs failed to fulfill their obligation to remit to Plaintiff, as of January 28, 2020, approximately $6,556,646.90 of prepetition CSA Proceeds and $442,817.51 of postpetition CSA Proceeds owed to Plaintiff under the CSA; and (ii) Defendants are required to remit any additional CSA Proceeds to Plaintiff within fifty days of Plaintiff invoicing Defendants, as provided under the Transaction Documents.

E.      A declaration that all future Accounts Receivable and CSA Proceeds shall be remitted to Plaintiff;

F.      In connection with the IT Services, Plaintiff seeks a declaration from the Court that Defendants are obligated under the Transaction Documents to provide Plaintiff with uninterrupted access to the IT Services as is are reasonably necessary for the performance of, and for Plaintiff to receive the benefit of, "Seller Services" under the TSA;

G.      An Order compelling Defendants to specifically perform their obligation to remit to Plaintiff all Accounts Receivable and CSA Proceeds, including to-be-received Accounts Receivable and CSA Proceeds owed to Plaintiff;

H.      Imposition of a constructive trust over the Accounts Receivable and CSA Proceeds, including to-be-received Accounts Receivable and CSA Proceeds, for the sole benefit of Plaintiff;

I.      In the interim, Plaintiff seeks an Order from the Court: (i) compelling Defendants to deposit the Accounts Receivable and CSA Proceeds, including Accounts Receivable and CSA Proceeds received in the future during the pendency of litigation, to Plaintiff, or if Defendants

dispute that certain amounts for Accounts Receivable and CSA Proceeds are owed to Plaintiff, then into an escrow account for those disputed amounts and (ii) enjoining Defendants from dissipating or otherwise transferring any Accounts Receivable and CSA Proceeds, including to-be-received Accounts Receivable and CSA Proceeds, except as otherwise ordered by the Court;

J.      Monetary damages caused by Defendants' breach of the Transaction Documents;

K.      Pre- and post-judgment interest;

L.      Plaintiff's attorneys' fees and costs incurred in connection with this action; and

M.      Such other relief the Court deems just and proper.

Date:  January 28, 2020                    Respectfully submitted,

                                           **REED SMITH LLP**

                                           */s/ Jason D. Angelo*
                                           Jason D. Angelo (No. 6009)
                                           1201 North Market Street, Suite 1500
                                           Wilmington, DE 19801
                                           Telephone:  (302) 778-7500
                                           Facsimile:  (302) 778-7575
                                           E-mail:  jangelo@reedsmith.com

                                           *Attorneys for Plaintiff TA Dispatch, LLC*